**TALK OF THE TOWN; Video Treasures, Inc.; Video Treasures, Ltd.; Raymond Pistol, President, Secretary and Treasurer, Plaintiffs–Appellants,**

v.

**DEPARTMENT OF FINANCE AND BUSINESS SERVICES, on behalf of CITY OF LAS VEGAS, Defendant–Appellee.**

**Talk of the Town; Video Treasures, Inc.; Video Treasures, Ltd.; Raymond Pistol, President, Secretary and Treasurer, Plaintiffs–Appellees,**

v.

**Department of Finance and Business Services, on behalf of City of Las Vegas, Defendant–Appellant.**

**Nos. 01–15303, 01–16390.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 11, 2003.

Filed Sept. 10, 2003.

Allen Lichtenstein, Las Vegas, NV, argued the cause for Talk of the Town and submitted briefs.

Peter M. Angulo, Rawlings, Olson, Cannon, Gormley & Desruisseaux, Las Vegas, NV, argued the cause for the City of Las Vegas and filed briefs. Thomas D. Dillard, Jr., also was on the briefs.

Before CANBY, JR., O'SCANNLAIN, and W. FLETCHER, Circuit Judges.

Opinion by Judge O'SCANNLAIN; Dissent by Judge CANBY

## OPINION

O'SCANNLAIN, Circuit Judge.

We must decide whether the First Amendment is implicated by the suspension of an establishment's erotic dancing license for violations of a city's alcohol licensing laws.

### I

In January and early February 1998, officers of the City of Las Vegas' Business License Department conducted some six overt and covert site investigations at Talk of the Town ("TOT"), a business licensed to present erotic dancing.[1] During the course of these investigations, inspectors themselves were allowed to bring onto the premises and consume alcoholic beverages, and witnessed other patrons doing the same, even though TOT did not possess a valid liquor license. On several occasions, upon inquiring of TOT employees about the availability of alcohol, the investigating officers were directed to a nearby liquor store.[2] On February 6, 1998, TOT was issued a "Notice to Cease & Desist." The notice informed TOT that it was in violation of Las Vegas Municipal Code ("LVMC") § 6.50.170, which forbids the sale or consumption of alcoholic beverages in any establishment lacking a valid alcoholic beverage license.

On March 10, 1998, the Las Vegas Department of Finance and Business Services drafted and served on TOT a "Complaint for Disciplinary Action" pursuant to the nuisance provisions of the LVMC, §§ 6.02.330(H)[3] and 6.02.370,[4] which subject those who operate without the appropriate license to "disciplinary action by the City Council for good cause." The "good cause" alleged in TOT's case was the numerous violations of the City's general liquor license provision, LVMC § 6.50.170, as well as § 6.35.100(F), which forbids the purchase, sale, or consumption of alcohol

---

**1.** Las Vegas Municipal Code ("LVMC") § 6.35.100(A) states that "[n]o person, firm, partnership, corporation or other entity shall advertise, or cause to be advertised, as an erotic dance establishment without a valid erotic dance establishment license...." TOT's premises also includes a bookstore, but the erotic dance area of the business was the subject of the investigation that triggered the instant litigation.

**2.** On one occasion, TOT's doorman, having pointed the way to the nearby liquor store, allegedly informed the undercover agents that, when it came to consumption of alcohol on the premises, "I'm blind in one eye and can't see out of the other."

**3.** This provision provides: "The licensee may be subject to disciplinary action by the City

Council for good cause, which may, without limitation, include: ... The actual business activity constitutes a public or private nuisance, or has been or is being conducted in an unlawful, illegal, or impermissible manner."

**4.** This section provides:

The doing of any act for which a license is required or the violation of any provision of this Title is declared to be unlawful and harmful to the safety, welfare, health, peace and morals of the residents and taxpayers of the City and constitutes a public nuisance per se, unless such act is done by a person who is authorized to do so by a license issued pursuant to this Title.

in any erotic dancing establishment that does not also possess a valid liquor license. The Department further requested that the City Council "[a]pprove the Complaint for Disciplinary Action and order a disciplinary hearing at which the Respondents shall appear and show cause why the licenses [5] that are the subject of this Complaint should not be suspended or revoked, or other disciplinary action taken...."

TOT's answer to the complaint denied the allegations and offered three affirmative defenses: "[1] Petitioner's Complaint is barred by insufficiency of process. [¶][2] The City of Las Vegas failed to provide the Petitioners adequate notice that the City considered the Respondents to be in violation of City ordinances. [3] The acts of the Respondents were neither willful, wanton, intentionally improper, nor taken in reckless disregard of the ordinances of the City of Las Vegas." In an order dated March 23, 1998, the mayor and City Council informed TOT that the complaint had been approved and that a hearing on the complaint would be held on May 20, 1998.

At the May 20 hearing, TOT was represented by counsel while the City was represented by the deputy city attorney. The proceedings were transcribed verbatim and the witnesses who appeared testified under oath and were subject to cross-examination. TOT was given the opportunity to present its own witnesses but chose not to do so. The City presented as witnesses the licensing officers who investigated the violations at TOT, and, on the

basis of their testimony, the council concluded that there was substantial evidence to support the allegations in the complaint. On May 29, 1998, the council issued findings of fact, conclusions of law, and an order imposing a three-week suspension of TOT's license to run an erotic dance establishment.[6] The order stated that "substantial evidence exists that TALK OF THE TOWN was in violation of Law Vegas Municipal Code §§ 6.50.170 and/or 6.35.100(F) and/or 6.02.330(H)." The order also stated that suspension of the erotic dancing license would go into effect fourteen days after service upon TOT. Service was made on the same day, but before the fourteen days ran, TOT filed suit in Nevada district court seeking declaratory and injunctive relief. TOT also moved for a stay of the suspension of their license. The stay was granted and the City subsequently removed the case to the federal district court.

Both parties filed motions for summary judgment. TOT's motion alleged that (1) the City's procedures in reaching the decision to suspend its license (i.e., its procedure of providing notice and a hearing before the City Council) violated its First and Fourteenth Amendment rights, and (2) the enforcement of the City's suspension of its license violated the First Amendment by failing to follow "well established procedural guidelines set forth by the federal courts for licensing decisions concerning [adult] businesses." With respect to the latter claim, TOT raised both a facial and as-applied challenge to § 6.35.140(D),[7] the provision of the LVMC

---

**5.** In addition to TOT's "Erotic Dance Establishment License," the complaint noted that TOT also possessed a "Coin Operated Amusement License" and a "Video Viewing License." The suspension of the latter two licenses was not challenged in the district court and neither party discusses them on appeal.

**6.** TOT's coin operated amusement and video viewing licenses were also suspended for three weeks.

**7.** This section provides:

> In the event the erotic dance license is suspended or revoked, the license suspension or revocation shall be stayed for fourteen days from the date of the written no-

that allows for judicial review of any suspension or revocation of a nude dancing license, on the grounds that it "fails to provide for prompt judicial review of a decision to suspend an erotic dance license during which time the status quo must be maintained." The City's opposition and counter-motion for summary judgment asserted that (1) TOT's First Amendment rights were not at issue, and (2) the procedures available were constitutionally adequate.

In due course, the federal district court rejected TOT's constitutional challenge to the procedures the City used in reaching the conclusion that TOT violated the alcohol ordinance.[8] With respect to TOT's challenge to the constitutionality of LVMC § 6.35.140(D), the district court found the provision lacked "safeguards regarding suspension or revocation of [an erotic dancing] license," and therefore concluded that it "is unconstitutional on its face." In the judgment accompanying its final order, the district court stayed the enforcement of the erotic dance license suspension, giving both parties a fourteen-day window within which to seek judicial review of the City's decision to suspend TOT's license and further held that if either party did seek judicial review, the stay would remain in place "until there is a final determination or decision by a judicial officer." If, however, neither party sought judicial review within that time, the court ordered that the stay would be automatically lifted.

Fourteen days later, on April 27, 2001, TOT filed and served on opposing counsel a "Motion to Amend and Emergency Motion for a Stay Pending Judicial Resolution." TOT contended that, because the district court had declared LVMC § 6.35.140(D) facially unconstitutional, and because that provision could not be severed from the rest of the City's license suspension/revocation scheme, the entire scheme was void. Because of the constitutional infirmity of § 6.35.140(D), TOT contended, the City *never* had the authority to suspend its license and could not now enforce its decision to do so, regardless of the district court's subsequent ruling and award of injunctive relief.

On April 28, 2001, the day after TOT filed its motion but before the district court ruled on it, the City moved to close the business pursuant to the 1998 decision by the City Council to suspend its erotic dance establishment license. TOT remained closed for three days, until May 1, 2001, when the district court granted the emergency stay and ordered oral argument for May 15, 2001, on the motion to amend.

On June 1, the district court denied the motion to amend judgment. The court entered a stay once again to allow TOT to appeal the court's determination.[9]

TOT, having substantially prevailed in the district court, timely appeals that court's remedy, urging reversal insofar as the ruling allows for any future enforce-

tice to the licensee for the licensee to seek judicial review. The licensee may waive the stay provision in writing, or the City may seek sooner to enforce the suspension or revocation by filing in the district court a petition for judicial review as provided by NRS 43.100 or by seeking alternative relief pursuant to Chapter 34 of NRS.

8. The district court noted that TOT "fail[ed] to offer any argument or cite any law suggesting that the procedure up to and including the City's decision [to suspend its license] violated

either Due Process or the First Amendment." In its opening brief before this court, TOT makes no reference to this claim. *See Officers for Justice v. Civil Service Commission,* 979 F.2d 721, 727 (9th Cir.1992) ("We will not ordinarily consider matters on appeal that are not specifically and distinctly raised and argued in appellant's opening brief.").

9. The district court also rejected the City's cross motion to revise its judgment in light of a new version of § 6.35.140(D) that had been passed in 2000.

ment of the May 20, 1998, decision by the Las Vegas City Council to suspend Talk of the Town's license. The City cross-appeals, challenging the district court's determination that the First Amendment is implicated in this case.

## II

We note at the outset that this case implicates two distinct lines of First Amendment jurisprudence. The first, or *O'Brien* line—named after the Supreme Court's decision in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)[10]—teaches that "generally applicable regulations of conduct implicate the First Amendment only if they (1) impose a disproportionate burden on those engaged in First Amendment activities; or (2) constitute governmental regulation of conduct with an expressive element." *Nunez v. City of San Diego*, 114 F.3d 935, 950 (9th Cir.1997). The second line of cases concerns "prior restraints" on speech that arise "when the enjoyment of protected expression is contingent upon the approval of government officials." *Baby Tam & Co. v. City of Las Vegas*, 154 F.3d 1097, 1100 (9th Cir.1998). The many cases that stand for the proposition that prior restraints on speech are presumptively unconstitutional, *see, e.g., Southeastern Promotions v. Conrad*, 420 U.S. 546, 558, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) ("Any system of prior restraint ... comes to this Court bearing a heavy presumption against its constitutional validity.") (internal quotations omitted), recognize as the source of this presumption the "principle that the freedoms of expression must be ringed about with adequate bulwarks." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).

The question, of course, is the extent to which these traditional "bulwarks" are necessary for the protection of TOT's constitutionally protected expression[11] when that expression is burdened solely as a result of TOT's violation of a generally applicable liquor license law. The City relies on the *O'Brien* line of cases to argue that no such protections are required, while TOT relies on the prior restraint line of cases to argue the contrary position. To resolve this issue, we must examine more closely the relevant authority from these two lines of cases.

## III

In *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986), the Supreme Court was faced with a constitutional challenge arising from the closure of an adult bookstore. An investigation by the authorities revealed that the bookstore was being used for, among other illicit purposes, the solicitation of prostitution. This discovery "formed the basis of a civil complaint against [the bookstore and its owners] seeking closure of the premises" under a state law that declared buildings used in the solicitation of prostitution to be nuisances. *Id.* at 699, 106 S.Ct. 3172. The bookstore challenged the imposition of the closure remedy as an infringement of its constitutionally protected bookselling activities.

■ In evaluating the bookstore's First Amendment claim, the Court noted its ear-

---

**10.** *O'Brien* "considered the First Amendment ramifications of a statute which imposed criminal sanctions on one who 'knowingly destroys, knowingly mutilates, or in any manner changes' a draft registration certificate." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 702, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986). The individual raising the constitutional challenge had burned his draft card to show his opposition to the Vietnam War.

**11.** There is no dispute that erotic dance establishments like TOT are venues for constitutionally protected expression. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000).

lier holding in *O'Brien* that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *O'Brien,* 391 U.S. at 376, 88 S.Ct. 1673. The Court nevertheless concluded that *O'Brien's* test [12] for evaluating the validity of the government's interest in imposing incidental limitations on expression simply was not implicated by the closure of the bookstore:

> [W]e have not traditionally subjected every criminal and civil sanction imposed through legal process to 'least restrictive means' scrutiny simply because each particular remedy will have some effect on the First Amendment activities of those subject to sanction. Rather, we have subjected such restrictions to scrutiny only where it was conduct with a significant expressive element that drew the legal remedy in the first place, as in *O'Brien,* or where a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity, as in *Minneapolis Star [& Tribune Co. v. Minnesota Commissioner of Revenue,* 460 U.S. 575, 581, 103 S.Ct. 1365, 75 L.Ed.2d 295 (striking down a tax imposed on the sale of newsprint because the tax fell disproportionately on the shoulders of newspapers).].

This case involves neither situation, and we conclude the First Amendment is not implicated by the enforcement of a public health regulation of general application against the physical premises in which respondents happen to sell books. *Arcara,* 478 U.S. at 706–07, 106 S.Ct. 3172. The Court concluded: "Bookselling in an establishment used for prostitution does not confer First Amendment coverage to defeat a valid statute aimed at penalizing and terminating illegal uses of premises." *Id.* at 707, 106 S.Ct. 3172.

*Arcara* makes clear that a sanction imposed pursuant to a generally applicable law does not trigger First Amendment scrutiny, even where the sanction results in a burden on expression.[13] Before the First Amendment protections against generally applicable regulations set forth in *O'Brien* can be invoked, therefore, a court must determine that the government is either (1) regulating conduct with an expressive component, or (2) imposing a disproportionate burden on those engaged in expressive conduct. *See Nunez,* 114 F.3d at 950 (citing *Arcara,* 478 U.S. at 703–04, 106 S.Ct. 3172).

■ Here, the section of the Las Vegas Municipal Code that bars the consumption of alcohol in establishments that lack valid liquor licenses, LVMC § 6.50.170, in no way can be said to regulate conduct containing an element of protected expression.[14] Nor can it be said

---

12. "[W]e think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *O'Brien,* 391 U.S. at 376–77, 88 S.Ct. 1673.

13. The Court did take pains to note that "[w]ere [the bookstore] able to establish the

existence of ... a speech suppressive motivation or policy on the part of the District Attorney, they might have a claim of selective prosecution." *Arcara,* 478 U.S. at 707 n. 4, 106 S.Ct. 3172. The Court found no evidence of such intent in the record, and the bookstore did not assert the existence of such intent before the trial court.

14. We recognize that the sections of the LVMC that regulate nude dancing establishments include a provision barring such businesses from serving or allowing the consumption of alcohol without a valid liquor license.

that the City's requirement that businesses obtain a valid liquor license before they are permitted to serve alcohol on their premises places a disproportionate burden on those engaged in expressive conduct: The requirement applies to all businesses, whether they be bookstores or bars.

Thus, were the dispute in this case limited to whether the City possessed the authority to punish TOT for its violations of the generally applicable liquor laws—even to the point of burdening TOT's expressive conduct—we could end our analysis here. For *Arcara* makes clear that TOT may not "use the First Amendment as a cloak for obviously unlawful" conduct. *Arcara,* 478 U.S. at 705, 106 S.Ct. 3172. TOT contends, however, that because the City sought as sanction the suspension of its erotic dancing license, the "prior restraint" line or First Amendment jurisprudence entitles TOT to certain procedural safeguards that were not provided here. We turn to this claim now.

## IV

The Supreme Court has long recognized that requiring an individual or a business to receive the permission of some governing authority before engaging in expressive conduct implicates the First Amendment. In *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), for example, the Supreme Court entertained a challenge to a Maryland law that created a State Board of Censors charged with, among other things, " 'approv[ing] and licens[ing] such films or views which are moral and proper, and . . . disapprov[ing] such as are obscene, or

such as tend, in the judgment of the Board, to debase or corrupt morals or incite to crimes.' " *Id.* at 52 n. 2, 85 S.Ct. 734 (quoting Md. Ann.Code, 1957, Art. 66A, § 6(a)). The broad discretion accorded to the Board, in the Court's view, created the "danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." *Id.* at 57, 85 S.Ct. 734 (internal quotation marks omitted). To check this broad discretion—and to ensure that it would not improperly bar protected expression—the court held that a "noncriminal process which requires the prior submission of a film to a censor avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." *Id.* at 58, 85 S.Ct. 734. The procedural safeguards, in the Court's view, were essential to cabin the censors's otherwise largely unfettered discretion to determine what constitutes suitable, non-obscene expression and what does not. The Supreme Court recognized that, unless such determinations—bound up as they are with the necessarily *legal* determination of whether a particular film is entitled to First Amendment protection— were subjected to prompt judicial review "to minimize the deterrent effect of an interim and possibly erroneous denial of a license." *Id.* at 59, 85 S.Ct. 734.

## A

More recently, the Supreme Court applied *Freedman's* reasoning in the context of licensing schemes for sexually oriented businesses like TOT. In *FW/PBS, Inc. v.*

*See* LVMC § 6.35.100(F) ("No erotic dance establishment licensee shall serve, sell, distribute, or suffer the consumption or possession of any intoxicating liquor, or any beverage represented as containing any alcohol upon the premises of the licensee without a valid liquor license."). The mere existence of such a redundant provision, however, cannot be said disproportionately to burden expressive conduct given that the provision reiterates—albeit in slightly different terms—the generally applicable requirement that alcohol may not be served or consumed without a valid license.

*City of Dallas,* 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), the Court was faced with a challenge to an ordinance that "regulate[d] sexually oriented businesses through a scheme incorporating zoning, licensing, and inspections." *Id.* at 220–21, 110 S.Ct. 596. The licensing portion of the scheme required the chief of police to approve the issuance of a sexually oriented business license to an applicant within thirty days of the receipt of the application. This thirty-day time limit, the Court noted, was qualified by a requirement that no license could be issued to a sexually oriented business "if the premises to be used [by the business] . . . have not been approved by the health department, fire department, and the building official as being in compliance with applicable laws and ordinances." *Id.* at 227, 110 S.Ct. 596 (internal quotation marks omitted). Because there was no requirement that the necessary inspections be conducted within the thirty-day time period—or indeed, within any time period at all—the Court concluded that the scheme ran afoul of the "core policy underlying *Freedman,*" namely, "that the license for a First Amendment-protected business must be issued within a reasonable period of time, because undue delay results in the unconstitutional suppression of protected speech." *Id.* at 228, 110 S.Ct. 596. The Court nevertheless recognized that "[t]he licensing scheme we examine today is significantly different from the censorship scheme examined in *Freedman.* In *Freedman,* the censor engaged in direct censorship of expressive material. . . . Under the Dallas ordinance, the City does not exercise discretion by passing judgment on the content of any protected speech." *Id.* at 229, 110 S.Ct. 596. The Court accordingly stopped short of imposing the same procedural requirements it required in

*Freedman,* instead concluding that the danger of allowing officials indefinitely to delay the granting of licenses for expressive conduct would be adequately checked by providing a "[l]imitation on the time within which the licensor must issue the license as well as the availability of prompt judicial review." *Id.* at 230, 110 S.Ct. 596.

### B

Our court first applied *FW/PBS's* "prompt judicial review" requirement to the denial of a sexually oriented business license in *Baby Tam & Co. v. City of Las Vegas,* 154 F.3d 1097, 1101 (9th Cir.1998) (striking down a different licensing statute because it failed to provide for prompt judicial review of the denial of a license). Soon after our holding in *Baby Tam,* we were presented with a challenge not to the procedures governing the *issuance* of sexually oriented business licenses, but rather to their revocation or suspension.

In *4805 Convoy, Inc. v. City of San Diego,* 183 F.3d 1108 (9th Cir.1999), a nude dancing establishment had its license suspended for two weeks after an inspection revealed that the club had violated regulations that required that "nude dancers be licensed and that they stay at least six feet away from patrons." *Id.* at 1110.[15] Convoy alleged that the procedures for suspending and revoking licenses "were unenforceable because they unconstitutionally restrained speech by failing to provide adequate procedural safeguards." *Id.* Relying on the principles announced by the Supreme Court in *FW/PBS*—which in turn relied upon the principles announced by the Court in *Freedman*—we held that the procedures for revoking or suspending a nude dancing license must either (1) "provide for prompt hearing and decision by a

---

**15.** Following an administrative appeal, it was determined that Convoy had violated the prohibition against unlicensed dancers but not the six-foot rule. The suspension accordingly was reduced from fourteen to seven days.

judicial officer," or (2) maintain the status quo (i.e., prohibit the enforcement of the suspension or revocation) until there has been a judicial decision on the merits. *Convoy*, 183 F.3d at 1116. Because the scheme at issue provided for only *discretionary* mandamus review of the license suspension decision, we declared it constitutionally insufficient and enjoined the enforcement of the suspension "so long as the City's ordinance and the ... statutory scheme fail to provide for a prompt hearing and decision by a judicial officer, or for the maintenance of the status quo pending a judicial decision on the merits." *Id.*

### C

Here, the district court relied on *Convoy* in support of its conclusion that

[LVMC] § 6.35.140(D) provides erotic dance establishment licensees the opportunity to *initiate* adequate judicial review of the City's suspension or revocation decision, but is unconstitutional in that it fails to provide either (1) a mechanism by which such review and determination will be prompt and adequate, or (2) a mechanism by which the status quo is preserved pending judicial review and determination.

But *Convoy* does not address the issue we face here: the burdening of expressive conduct as a result of the speaker's violation of a generally applicable provision barring the sale or consumption of alcohol in an establishment lacking a valid liquor license. In short, the burdening of expressive conduct here is merely the incidental result of the City's clear authority to enforce its generally applicable liquor license requirement. As Justice White noted in his partial concurrence in *FW/PBS*, "the predicate identified in *Freedman* for imposing its procedural requirements is absent in [such] cases." *FW/PBS*, 493 U.S. at 245, 110 S.Ct. 596 (White, J., concurring in part and dissenting in part). Instead, we are faced with a situation in which

" 'nonspeech' conduct subject to a general regulation bears absolutely no connection to any expressive activity," *Arcara*, 478 U.S. at 706 n. 3, 106 S.Ct. 3172—save only the mere happenstance that the nonspeech conduct took place in the same location as that expressive conduct and led to the imposition of a penalty that burdened it. *Arcara*, however, makes clear that the presence of protected expressive conduct alongside unprotected, illicit conduct in the same establishment does not bar enforcement of a generally applicable law. *Id.* at 707, 106 S.Ct. 3172.

### 1

■ TOT attempts to distinguish *Arcara*. First, TOT notes that the closure remedy affirmed by the Court in *Arcara* was the result of a generally applicable nuisance abatement statute, whereas the license suspension in the instant case was achieved by way of LVMC § 6.35.140, a provision that specifically applies to nude dancing establishments. The City, according to TOT, could have proceeded under generally applicable nuisance abatement procedures like those employed in *Arcara*, but chose not to do so. TOT, however, misreads the record. The City *did* proceed under a generally applicable procedure. Indeed, the "Complaint for Disciplinary Action" never mentions LVMC § 6.35.140 and instead relies upon the generally applicable LVMC § 6.02.330(H), which provides: "The licensee may be subject to disciplinary action by the City Council for good cause, which may, without limitation, include: [¶] ... The actual business activity constitutes a public or private nuisance, or has been or is being conducted in an unlawful, illegal or impermissible manner." Thus, the procedures employed by the City in this case—just like the liquor laws that triggered their application—are laws of general applicability. Indeed, a review of the reporter's transcript

of the hearing before the City Council indicates that the procedures of LVMC § 6.35.140 were raised not by the Council, which according to the initial complaint was proceeding under its general authority to discipline *any* licensee "for good cause" pursuant to LVMC § 6.02.330(H), but rather by counsel for TOT, who invoked the provision to stay the imposition of the suspension for fourteen days. When the issue of when the three-week suspension of TOT's license would commence, TOT's counsel interjected:

> Just a moment. I think, you know, one of the problems we have here is that you have entered this finding and you are entering this penalty and this complaint was drafted raising several different sections of the code. Now, one of those sections, 6.35.100[sic], I believe, has an automatic fourteen day stay. And if you made the finding with respect to that section here, and I assume that you have ... [t]hen there's an automatic fourteen day stay that goes in because of that. So ... what I would ask is that ... it commence when the findings in [sic] fact and conclusions of law are submitted, but that's when the fourteen day stay kicks in, because there's absolutely no reason to the contrary.

Thus, the Council allowed TOT *greater* procedural protections even though, by the terms of LVMC § 6.03.330, it was not required to do so.

### 2

■ TOT's second asserted distinction between this case and *Arcara*, namely that the nuisance abatement proceedings in *Arcara* took place before a judge, is similarly unavailing. For while TOT is correct that the closure of the business in *Arcara* was imposed following a civil action tried before a judge, the Supreme Court most certainly did not hold that *any* sanction pursuant to generally applicable regulations must first be subjected to judicial

scrutiny if it happens to burden expressive conduct. Indeed, the Court indicated that precisely the opposite was true: "If the city imposed closure penalties for demonstrated Fire Code violations or health hazards from inadequate sewage treatment, the First Amendment would not aid the owner of premises who had knowingly allowed such violations to persist." *Arcara*, 478 U.S. at 705, 106 S.Ct. 3172. The Court's reference to violations of the fire and health codes—determinations made at least as often by *administrative* bodies as judicial ones—indicates that the identity of the body imposing the sanction is irrelevant when the conduct that gives rise to the sanction "manifests absolutely no element of protected expression." *Id.* at 705, 106 S.Ct. 3172. Indeed, it is *precisely because* the conduct at issue in *Arcara* was not protected, that no special procedural safeguards—such as prompt determination by a judicial officer—were necessary. *See FW/PBS*, 493 U.S. at 245, 110 S.Ct. 596 (White, J., concurring in part and dissenting in part). ("[T]he predicate identified in *Freedman* for imposing its procedural requirements is absent in [such] case[s].").

### 3

■ TOT's third argument in favor of distinguishing *Arcara* is that, unlike the bookstore in that case, TOT is not "free to carry on its [protected expression] at another location." *Arcara*, 478 U.S. at 706 n. 2, 106 S.Ct. 3172. That is, because its license would be suspended for three weeks, and because one must have a license to exhibit nude dancing in Las Vegas, TOT contends that its First Amendment rights will be completely suppressed for the duration of the suspension because the relocation option available to the bookstore in *Arcara* is not open to TOT. It is clear from the Court's opinion in *Arcara*, however, that, while salient, the bookstore's ability to reopen in another location

was not dispositive. Two facts in the record convince us that, like the closure remedy approved by the Court in *Arcara*, "[t]he severity of th[e] burden [imposed on TOT] is dubious at best." *Arcara*, 478 U.S. at 705, 106 S.Ct. 3172. First, the closure of the bookstore in *Arcara* was to last for a period of one year, significantly longer than the three-week suspension at issue here. By imposing a relatively brief suspension to punish its unlawful nonexpressive activity, the City "properly sought to protect the environment of the community by directing the sanction at premises knowingly used for lawless activities." *Arcara*, 478 U.S. at 707, 106 S.Ct. 3172. And second, as with the action taken in *Arcara*, there is absolutely no evidence that the suspension imposed here was a pretext for the suppression of protected expression. *See Arcara*, 478 U.S. at 707 n. 4, 106 S.Ct. 3172 ("Were respondents able to establish the existence of such a speech suppressive motivation or policy on the part of the District Attorney, they might have a claim of selective prosecution."); *id.* at 708, 106 S.Ct. 3172 (O'Connor, J., concurring) ("If, however, a city were to use a nuisance statute as a pretext for closing down a bookstore because it sold indecent books ... the case would clearly implicate First Amendment concerns and require analysis under the appropriate First Amendment standard of review.").[16]

## V

Because *Arcara* compels the conclusion that the City's sanctioning of TOT for repeated violations of the liquor license requirement does not implicate the First Amendment, the district court erred in concluding that the procedural requirements identified by our *Convoy* decision are applicable here. Accordingly, we must reverse that portion of the district court's order according TOT *Convoy's* procedural safeguards and remand to that court for further proceedings not inconsistent with this opinion. In light of our resolution of the First Amendment issue, TOT's appeal of the remedy is moot.

REVERSED and REMANDED.

CANBY, Circuit Judge, dissenting.

I respectfully dissent from the majority opinion because of a narrow but important point on which we differ. The majority relies on *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986), in which the Supreme Court held that the First Amendment was not implicated when a county instituted nuisance proceedings and closed a building used by an adult bookstore because it was serving as a place of prostitution. The majority here holds that *Arcara* applies because the City of Las Vegas proceeded against Talk of the Town under its general nuisance ordinance (although it also proceeded under a similar clause in the ordinance regulating erotic dancing establishments). The City is therefore merely enforcing a generally applicable law directed at non-speech activity, according to the majority.

The analogy to *Arcara* fails, in my opinion, because the City here did not merely shut down Talk of the Town's premises for two weeks because it permitted alcoholic beverages to be consumed there. Instead, it suspended Talk of the Town's permit to present erotic dances. This remedy is clearly directed at expressive activity. During the suspension, Talk of the Town may still use its building for other purposes, even though it has been the scene of liquor violations. What it may not do is engage in the expressive activity of presenting erotic dances, on the existing

---

**16.** Because it relies upon an assumption that First Amendment scrutiny is required in this case, we also reject TOT's due process challenge to LVMC § 6.35.140(D).

premises or anywhere else in Las Vegas. Because the suspension is directed at expression, the First Amendment is necessarily implicated.

In that situation, the precedent that should govern our decision is *4805 Convoy, Inc. v. City of San Diego,* 183 F.3d 1108 (9th Cir.1999). In *Convoy,* the City suspended a nude entertainment license because of the use of unlicensed dancers. We held that such a suspension was subject to the First Amendment requirements of either a speedy judicial review or a stay of enforcement until the completion of judicial review. *See id.* at 1114–16 (relying on *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), and *Baby Tam & Co. v. City of Las Vegas,* 154 F.3d 1097, 1100 (9th Cir.1998)). Because the City of San Diego's scheme for suspending nude entertainment licenses did not meet these requirements, we enjoined enforcement of any license suspension or revocation until completion of judicial review. *See id.* at 1116.

The district court in the present case properly concluded that the Las Vegas ordinance authorizing suspension of erotic dancing licenses failed to meet the First Amendment requirement of speedy judicial review or a stay of enforcement until completion of judicial review. It therefore followed *Convoy* and enjoined any suspension or revocation of erotic dancing licenses prior to completion of judicial review. In so ruling, the district court honored the First Amendment limitations on prior restraint of expression. *See Freedman v. Maryland,* 380 U.S. 51, 58–59, 85 S.Ct.

734, 13 L.Ed.2d 649 (1965). I would affirm the district court's judgment.[1]

---

**1.** Talk of the Town contends that the district court, having found the ordinance unconstitutional, should have enjoined further enforcement totally because the portions of the ordinance relating to prompt judicial review (or its absence) were not severable. I do not discuss the severability argument because the majority did not reach it. It suffices to say that I conclude that the district court was correct.